DISSENT KAREN NELSON MOORE, Circuit Judge, dissenting. I agree with the majority that Campbell’s petition is newly ripe, but I respectfully dissent from the conclusion that he is necessarily attempting to seek relief in the wrong forum. Because I believe that he has raised sufficient newly present biological facts to render his own death sentence potentially unconstitutional and thus to render his habeas petition not “second or successive” for purposes of 28 U.S.C. § 2244(b), I would instead remand this case to the district court for further proceedings. Campbell has, as the majority observes, detailed a host of ailments that have befallen him since 2003, when he filed his first petition. Specifically, he asserts; Since 2003, ... Campbell’s health has progressively, and acutely, worsened, with multiple severe and life-threatening ailments arising almost every year: 2003—diagnosis of pulmonary hypertension; 2004—diagnosis of increased scarring in the lungs and growing nodules in the upper lungs and severely worsening emphysema leading to concerns with air hunger; 2006—diagnosis of Chronic Obstructive Pulmonary Disease (COPD) and emphysema classified as “end stage,” diagnosis of collapsed lung and respiratory failure, sarcoidosis (for which there is not cure), coronary artery disease, atrial fibrillation, hypertension, deep vein thrombosis and pulmonary embolism; 2012—hypoxemic respiratory failure (starving for oxygen), histoplas-mosis, atrial fibrillation with rapid and out of rhythm heartbeats; 2014—diagno-sis of worsening COPD exacerbation, increasing nodules, in lungs, emphysema increasing in lungs, discovery of an aortic aneurysm; 2015—diagnosis of prostate cancer and surgical prostatectomy, spontaneous collapsed lung requiring a life flight to OSTJ Hospital; and a diagnosis of MRSA while at OSU Hospital; 2016—hip replacement surgery after being knocked down by another inmate, while at OSU Hospital staff discovered a gangrenous colon and 2 surgeries were required to remove the colon and equip him with an external colostomy bag; 2017—diagnosis of pneumonia after being hospitalized for coughing up blood. In addition to these physical characteristics that inhibit his ability to breathe, Campbell must take oxygen treatments four times a day in order to function, and he relies on a walker for very limited mobility. Pet.’s Mot. to Remand at 17-18; see also R. 19-1 (Amended Pet. for Writ of Habeas Corpus at 26-27) (Page ID #522-23). As Campbell argues: “All of these conditions are sure or very likely to increase the air hunger that Campbell will necessarily suffer as the result of the State’s administration of any lethal injection drug, and increase the sure or near certain likelihood that Campbell will suffer a paradoxical reaction to the administration of any lethal injection drug—thus rendering any attempt of the State to execute him [given the unavailability of alternative methods] unconstitutional.” Pet’s Mot. to Remand at 18-19. Were Campbell simply challenging Ohio’s generalized use of a particular execution protocol without offering a “known and available alternative,” I agree with the majority that Glossip v. Gross, - U.S. -, 135 S.Ct. 2726, 2739, 192 L.Ed.2d 761 (2015), would foreclose his claim. Such a ruling would be tantamount to declaring the death penalty as a whole unconstitutional in a given state, and the Court has “time and again reaffirmed that capital punishment is not per se unconstitutional.” Id. I see an important distinction between Glossip and Campbell’s case, however, in the fact that while Glossip featured an across-the-board challenge to the only approved methods of execution in Oklahoma, this case concerns only whether “the fact of [Campbell’s] sentence itself,” Nelson v. Campbell, 541 U.S. 637, 644, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), is constitutional in light of Campbell’s personal biological characteristics and the currently available means of execution. The majority correctly characterizes Campbell as seizing on this distinction by drawing an analogy between his biological ailments and the neurobiological ailments that the Court has made clear can under-gird a successful habeas petition without running afoul of the § 2244(b) “second or successive” bar, see Panetti v. Quarterman, 551 U.S. 930, 945-47, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); see also Stewart v. Martinez-Villareal, 523 U.S. 637, 645, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). Such arguments from mental incompetency, often referred to as Ford claims after Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding that the Eighth Amendment prohibits executing a person who is insane), clearly fall outside Glossip’s scope: A person who is insane when his execution date is set can still sue in habeas, and need not assert (as if he could) alternative means by which he can be killed that are somehow not at odds with the Eighth Amendment. See, e.g., Panetti, 551 U.S. at 945-47, 127 S.Ct. 2842. Medical science, as the majority recognizes, has meanwhile debunked the ostensible divide between mental and physical health, showing that many mental-health problems are issues of brain biology just as pulmonary problems are issues of lung biology. See, e,g., Brian D. Shannon, The Brain Gets Sick, Too: The Case for Equal Insurance Coverage for Serious Mental Illness, 24 St. Mary’s L.J. 365, 367 (1993) (observing that “medical researchers have made numerous findings establishing that serious mental illnesses such as schizophrenia, bipolar affective disorder, and depressive illness are biologically-based diseases of the brain” (footnotes omitted)). In light of that mounting awareness, it seems “[a]n empty formality,” Panetti, 551 U.S. at 946, 127 S.Ct. 2842, to say that one petitioner’s habeas claim is cognizable because his brain’s biology has deteriorated substantially between the imposition and scheduled execution of a death sentence while saying that the petition of another whose biology has deteriorated in some other but equally significant way during the same span is necessarily barred. Just because such factual situations may be rare does not mean that they do not exist.[1] And in my view, Campbell has asserted sufficient biological deterioration—given the extraordinary list of ailments detailed above, see Pet’s Mot. to Remand at 17-18—to justify remand for factfinding here. I thus believe that Campbell’s petition is not foreclosed by Glossip, and instead that he has fit his claim into the cognizable form that we outlined in Adams v. Bradshaw, 826 F.3d 306 (6th Cir. 2016), cert. denied, - U.S. -, 137 S.Ct. 814, 196 L.Ed.2d 602 (2017). There, we distinguished Hill v. McDonough, 547 U.S. 573, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), which directed petitioners whose claims would “leave the State free to use an alternative lethal injection procedure” to bring suit under § 1983, id. at 580-81, 126 S.Ct. 2096, from a case in which “lethal injection cannot be administered in a constitutional manner,” and thus where the “claim ‘could render [the] death sentence effectively invalid.’ ” Adams, 826 F.3d at 321 (quoting Hill, 547 U.S. at 580, 126 S.Ct. 2096). We explained that this distinction was “consistent with the Supreme Court’s reasoning in Nelson, which suggested that, under a statutory regime similar to Ohio’s, ‘a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself.’ ” Id. (quoting Nelson, 541 U.S. at 644, 124 S.Ct. 2117). As I see it, that is Campbell’s argument here: because of newly developed biological facts, the state cannot constitutionally execute him by lethal injection, and because the state cannot execute him by any means other than lethal injection under Ohio law, his death sentence cannot now be carried out in a way that is consistent with the Eighth Amendment. The Court in Ford did not specify exactly why it would violate the Eighth Amendment to kill someone who is insane at the time of execution; the Court’s ultimate conclusion was simply that “[w]hether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction [on executing the insane] finds enforcement in the Eighth Amendment.” Ford, 477 U.S. at 410, 106 S.Ct. 2595. There are situations in which killing a person whose mental biology has deteriorated would be an exercise in mindless vengeance, and there are situations in which killing a person whose physical biology has deteriorated would be an exercise in mindless vengeance. Whether the biological facts asserted here are ultimately adequate to justify relief is, of course, for the district court to decide in the first instance—perhaps they are not. But because Campbell has directed us to sufficiently specific and recent biological facts that make his petition newly ripe- and that could .potentially make his personal death sentence unconstitutional, I would remand for further proceedings to assess whether Campbell’s assertions in fact rise to that level. I therefore respectfully dissent. . Consider, for example, a state that permits execution only by lethal injection and a defendant who after his first habeas petition develops a severe allergy to all available execution drugs, thereby guaranteeing lengthy and excruciating pain at any dose. Why wouldn’t that case be more like Ford than Glossip, when it would apply uniquely to the petitioner—and thus not challenge the state's overall protocol—but still challenge the “fact of the sentence itself,” see Nelson v. Campbell, 541 U.S. 637, 644, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004)?